William E. WOLFE, Plaintiff–Appellant,

v.

Donna SHALALA,[1] Secretary of Health and Human Services, Defendant–Appellee.

No. 92–1257.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1992.

Decided June 24, 1993.

Robert E. Francis (argued), Dennis B. Fentress, Francis Law Office, Cadiz, KY, for plaintiff-appellant.

Jill E. Zengler, Indianapolis, IN, Charles R. Goldstein (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, Chicago, IL, for defendant-appellee.

1. Donna E. Shalala is substituted for her predecessor, Louis W. Sullivan, as Secretary of Health and Human Services pursuant to Fed.R.App.P. 43(c)(1).

Before BAUER, Chief Judge, CUMMINGS, Circuit Judge, and GRANT, Senior District Judge.[2]

GRANT, Senior District Judge.

In 1988, William Wolfe filed an application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d). When his application was denied by the Secretary of Health and Human Services ("Secretary"), he sought judicial review of the adverse decision under 42 U.S.C. § 405(g). The district court denied Mr. Wolfe's motion for summary judgment and affirmed the Secretary's decision, and this appeal followed.

## I. BACKGROUND

Although Mr. Wolfe has suffered from a variety of ailments during his lifetime, he listed only two on his application for disability insurance benefits: an arthritic condition affecting his neck and osteoarthritis in both knees. Mr. Wolfe contends that these conditions made it impossible for him to continue working after November 16, 1987, the alleged onset date of his disability.

The Administrative Law Judge ("ALJ") who heard Mr. Wolfe's case disagreed. He found on the basis of evidence presented at an initial hearing on October 19, 1988 that Mr. Wolfe retained the residual functional capacity to perform his past relevant work as a part-time automobile salesman at Dick Leonard Ford and was therefore not disabled within the meaning of the Act. 20 C.F.R. § 404.1520(e). The Appeals Council, however, granted Mr. Wolfe's request for review and remanded the case for further proceedings. A second supplemental hearing was conducted on February 23, 1990, and on March 26, 1990 the ALJ found for a second time that Mr. Wolfe was not disabled because he was capable of performing the light work required of him at Dick Leonard Ford. When the Appeals Council denied Mr. Wolfe's second request for review, the ALJ's decision of March 26, 1990 became the final decision of the Secretary of Health and Human Services.

## II. STANDARD OF REVIEW

■ Our review, like that of the district court, focuses on the Secretary's final decision—in this case, the ALJ's order of March 26, 1990.[3] We review the ALJ's factual findings to determine whether they are supported by substantial evidence in the record as a whole. *Callaghan v. Shalala,* 992 F.2d 692, 694–95 (7th Cir.1993); *Micus v. Bowen,* 979 F.2d 602, 604 (7th Cir.1992). If they are, and we find no error of law, the Secretary's decision must be affirmed. *Kapusta v. Sullivan,* 900 F.2d 94, 96 (7th Cir.1989); *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir. 1984).

## III. DISCUSSION

Mr. Wolfe contends that the ALJ failed to follow "prescribed legal procedures" in rendering his decision. More specifically, he contends that the ALJ failed to properly evaluate his past relevant work and his complaints of pain, or to consider the combined effect of his impairments on his ability to work. We discuss each of these issues in turn.

### A. "Past Relevant Work"

In determining disability, the ALJ was required to address each of the following questions in sequential order: (1) Is the claimant presently employed? (2) Is the

---

**2.** The Honorable Robert A. Grant, Senior District Judge, United States District Court for the Northern District of Indiana, is sitting by designation.

**3.** Mr. Wolfe asks this court to include in its review evidence which he submitted for the first time to the Appeals Council with his second request for review. Had the Appeals Council granted that request and issued a decision on the merits, we would have been free to consider all of the evidence which was before it. *Eads v. Secretary of the Dept. of Health and Human Services,* 983 F.2d 815, 817 (7th Cir.1993). It did not. The ALJ's decision of March 26, 1990 thus stands as the Secretary's final decision, and it is that decision and the evidence which was before the ALJ which is before us on review. Although technically a part of the administrative record, the additional evidence submitted to the Appeals Council cannot now be used as a basis for a finding of reversible error. *Id.; Micus v. Bowen,* 979 F.2d 602, 606 n. 1 (7th Cir.1992).

claimant's impairment or combination of impairments severe? (3) Do his or her impairments meet or exceed any of the specific impairments listed in 20 C.F.R. Pt. 404, Subpt.P., App. 1 which the Secretary acknowledges to be conclusively disabling? (4) Have the claimant's impairments limited his or her remaining or "residual" functional capacity to the point that he or she is no longer able to perform the demands and duties of a former occupation? (5) Is the claimant unable to perform any other work in the national economy given his or her age, education and work experience? 20 C.F.R. § 416.-920(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–92, 96 L.Ed.2d 119 (1987); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992); *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991).

> A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at step three or five results in a finding of disability.

*Young*, 957 F.2d at 389. In Mr. Wolfe's case, the inquiry stopped at step four. Our discussion begins there.

Under the fourth step of the evaluation, a claimant must be found "not disabled" if he retains the residual functional capacity to perform *either*:

> 1. The actual functional demands and job duties of a particular past relevant job; *or*
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

Social Security Ruling 82–61; *Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir.1988); *Steward v. Bowen*, 858 F.2d 1295, 1301 (7th

Cir.1988); *Veal v. Bowen*, 833 F.2d 693, 697 (7th Cir.1987). The ALJ employed only the first of these two tests. He found on the basis of the evidence presented at both hearings that Mr. Wolfe was capable of performing the actual duties and demands required of him as an automobile salesman at Dick Leonard Ford, and was therefore not disabled.

Mr. Wolfe disagrees. He contends that his past work at Dick Leonard Ford was not relevant because he worked only part-time under special circumstances and did not perform the full range of duties generally required of an automobile salesperson. Such a job, he argues, could not be considered "substantial gainful activity." [4]

The Department of Labor's *Dictionary of Occupational Titles* (DOT) sets the general standard by which Mr. Wolfe's job may be compared. It describes the mental and physical requirements of a variety of jobs as those jobs are generally performed in the national economy. Section 273.353–010 of the DOT is relevant in Mr. Wolfe's case and provides:

### SALESPERSON, AUTOMOBILES

#### (retail trade)

Sells new or used automobiles, trucks, and vans on premises of vehicle sales establishment: Explains features and demonstrates operation of car in showroom or on road. Suggests optional equipment for customer to purchase. Computes and quotes sales price, including tax, trade-in allowance, license fee, and discount, and requirements for financing payment of vehicle on credit. Performs other duties as described under SALESPERSON (retail trade; wholesale tr.) Master Title.[5] May

---

4. To be relevant, past work must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted "substantial gainful activity." 20 C.F.R. § 404.-1565(a); *Lauer v. Bowen*, 818 F.2d 636, 639 (7th Cir.1987). Mr. Wolfe challenges only the latter requirement.

5. SALESPERSON (retail trade; wholesale tr.) Sells merchandise to individuals in store or showroom, utilizing knowledge of products sold: Greets customer on sales floor and ascer-

tains make, type, and quality of merchandise desired. Displays merchandise, suggests selections that meet customer's needs, and emphasizes selling points of article, such as quality and utility. Prepares sales slip or sales contract. Receives payment or obtains credit authorization. Places new merchandise on display. May wrap merchandise for customer. May take inventory of stock. May requisition merchandise from stockroom. May visit customer's home by appointment to sell merchandise on shop-at-home basis. . . .

be designated Salesperson, New Cars (retail trade); Salesperson, Used Cars (retail trade).

*Dictionary of Occupational Titles,* Vol. 1, § 273.353–010 (4th Ed.1991).

Mr. Wolfe's description of his job at Dick Leonard Ford conforms substantially with the DOT description. The only exception involved the actual financing of the sale once a car was sold. Mr. Wolfe testified that, once a sale was made, he turned the buyer over to someone else who made the financial arrangements. He contends on appeal that his job was therefore different from the norm and that the ALJ failed to take this "special circumstance" into consideration. We disagree. There is no indication in the record that other salespeople at Dick Leonard Ford were required to handle the closing transactions, or that Mr. Wolfe lacked the mental or physical capacity to do that job if it had been required of him.

The only other "special circumstance" to which Mr. Wolfe refers is the fact that he got the job because he knew the owner, Dick Leonard. There is no evidence to suggest, however, that Mr. Wolfe's association with Mr. Leonard rendered his job any less substantial. He was required to perform virtually all of the duties required of a full-time employee, although only on a part-time basis, and was paid accordingly.

The mere fact that Mr. Wolfe may have worked only part-time, two afternoons a week, would not have rendered his previous employment any less substantial. Although the time a claimant spends on the job is important in determining whether he or she is engaged in "substantial gainful activity," it alone is not dispositive. 20 C.F.R. § 404.-1573(e). *See also* Social Security Ruling 83–33; *Keller v. Sullivan,* 928 F.2d 227, 232 (7th Cir.1991); *Pitts v. Sullivan,* 923 F.2d 561, 565 (7th Cir.1991). Work is "substantial" if it involves significant physical and mental activities, and "gainful" if it is usually done for pay or profit, even though a profit may not actually be realized. 20 C.F.R. § 404.-1572(a) and (b); Social Security Ruling 83–33; *Callaghan,* 992 F.2d at 695. A claimant

may be presumed to have been engaged in "substantial gainful activity" based on his earnings. 20 C.F.R. § 404.1574(a) and (b); *Dugan v. Sullivan,* 957 F.2d 1384, 1390 (7th Cir.1992); *Pitts,* 923 F.2d at 565. Under the earnings guidelines established by the Administration, a claimant whose earnings averaged more than $300 a month in calendar years after 1979 and before 1990 is ordinarily presumed to have engaged in substantial gainful activity. 20 C.F.R. § 404.-1574(b)(2)(vi). It is undisputed that Mr. Wolfe's earnings while at Dick Leonard Ford fell within those guidelines.

The only evidence presented in rebuttal came from the vocational expert, Dr. Joel Dill. When asked at the first hearing whether there were a significant number of jobs available to Mr. Wolfe if he could work only two to three hours a day, Dr. Dill responded, "No, the numbers would be drastically cut and I wouldn't consider it substantial gainful activity." (A.R. 71). At the second hearing, Dr. Dill opined that Mr. Wolfe would need to be able to work on a full-time basis to be considered viable for substantial gainful activity. (A.R. 109). The ALJ accorded Dr. Dill's statements little, if any, weight. The reasons are self-evident. His statements were based on an inaccurate hypothetical, i.e., an assumption that Mr. Wolfe could work only two to three hours a day, and were contrary to the law. *See* 20 C.F.R. §§ 404.-1572(a) and (b), 404.1573(e); Social Security Ruling 83–33; *Keller,* 928 F.2d at 232 ("Work may be substantial even if it is done on a part time basis"); *Pitts,* 923 F.2d at 565. As such, they were properly disregarded. *Cronkhite v. Sullivan,* 935 F.2d 133, 134 (8th Cir.1991).

**· B.  Residual Functional Capacity**

■ Having found substantial evidence in the record to support the ALJ's determination that Mr. Wolfe's past work was relevant, we turn to the real issue at hand: whether Mr. Wolfe retained the residual functional capacity to perform that work. The ALJ found that he did. Mr. Wolfe contends that he did not. The evidence is conflicting.

*Dictionary of Occupational Titles,* Master Titles    and Definitions.

Although Mr. Wolfe listed both arthritis in the neck and osteoarthritis in the knees as the cause of his disability, his testimony and the medical evidence which was presented to the ALJ focused primarily on the latter. There appears to be little dispute that the condition of Mr. Wolfe's knees prior to November 16, 1987 was severe—so severe that two of his physicians, Dr. Phillip Kinman and Dr. R.J. Burke, indicated that total knee replacements might be necessary. (A.R. 192, 194). In December of 1987, a month after the alleged onset of disability, Mr. Wolfe entered Kendrick Memorial Hospital for that purpose. (A.R. 196–203). Dr. Merrill Ritter performed the surgery, replacing both of Mr. Wolfe's knees with prosthetic joints. The surgery went well, and Mr. Wolfe's prognosis for rehabilitation was listed as good to excellent. (A.R. 203). The only limitations which Dr. Ritter imposed following the surgery related to running, jumping, jerking or pulling the leg, and lifting over twenty pounds. (A.R. 144, 204–07). In response to questions posed by Mr. Wolfe's attorney in a letter dated September 27, 1988, Dr. Ritter indicated that Mr. Wolfe was not, to the best of his knowledge, experiencing any problems with the knee replacements, that his prognosis for recovery was excellent, and that Mr. Wolfe was capable of standing or sitting for an eight hour work day provided he did not lift over twenty pounds. (A.R. 278). Dr. Ritter's opinion has not varied. In a letter dated October 3, 1989, he reiterated that Mr. Wolfe was capable of standing for six to eight hours a day without jeopardizing the longevity of the prostheses and that while "he may get a little sore," it would not be detrimental to him in any way. (A.R. 325). Two of the three consulting physicians who were called upon to review Mr. Wolfe's medical condition concurred with Dr. Ritter's findings.

Balanced against this evidence were several statements by Mr. Wolfe's personal physician, Dr. Charles Hendrix, Jr. Although Dr. Hendrix acknowledged that the total knee replacements had stabilized Mr. Wolfe's condition, he believed that the pain and stiffness he might experience with prolonged use rendered him incapable of sitting or standing for an eight hour work day. (A.R. 215, 285, 322–24). He therefore concluded that Mr. Wolfe was totally and permanently disabled from the arthritic condition of his knees. (A.R. 285, 322).

Dr. Ramana Reddy, the only consulting physician actually to examine Mr. Wolfe, concurred with Dr. Hendrix's statement that Mr. Wolfe was incapable of engaging in any activity which would require him to sit or stand for an eight hour work day. (A.R. 326–31). Dr. Reddy found that Mr. Wolfe's mobility and stability were good, as was the range of motion of his knees, but indicated that certain restrictions could be expected, including constant or considerable walking or standing, climbing, kneeling, stooping, running and lifting anything more than ten to fifteen pounds. (A.R. 327). Assuming Mr. Wolfe's job requirements would not exceed those limitations, Dr. Reddy opined that Mr. Wolfe could work ten hours per week doing light work. (A.R. 328, 331).

The ALJ found that Dr. Ritter's expertise and familiarity with Mr. Wolfe's case rendered his opinion regarding Mr. Wolfe's functional limitations the more persuasive of those presented, and accorded it the greater weight. Mr. Wolfe disagrees with that determination. He contends that Dr. Hendrix has been his treating physician since 1985, and that his opinion should therefore have been outcome determinative. Mr. Wolfe's understanding of the law is incorrect.

Dr. Hendrix is an internist who has treated Mr. Wolfe since 1985 primarily for hypertension, a condition which Dr. Hendrix himself describes as mild and well-controlled with medication. His familiarity with Mr. Wolfe's knee problems is thus subject to speculation. His statements regarding the extent of Mr. Wolfe's disability were conclusory, unsupported by any objective medical findings, and contrary to his own medical assessment of Mr. Wolfe's actual functional capacity; and were accordingly entitled to little weight. *Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982). Dr. Ritter's statements on the other hand were backed by his experience, expertise and first-hand knowledge of Mr. Wolfe's case and similar cases. *See Stephens v. Heckler,* 766 F.2d 284, 288 (7th Cir.1985). To the extent their

opinions actually conflicted, the ALJ accorded the greater weight to Dr. Ritter's opinion. As a reviewing court, we may not reweigh the evidence, *Kapusta,* 900 F.2d at 96, or reconsider credibility determinations unless those determinations are patently wrong. *Kelley v. Sullivan,* 890 F.2d 961, 964–65 (7th Cir.1989); *Imani on Behalf of Hayes v. Heckler,* 797 F.2d 508, 512 (7th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). How the conflict was resolved in Mr. Wolfe's case was for the ALJ to decide, "subject only to the rule that the final decision must be supported by 'substantial evidence.'" *Stephens,* 766 F.2d at 288. *See also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987). We find that it was.

We note, however, that in many material respects the statements do not actually conflict. All treating and consulting physicians appear to agree that Mr. Wolfe is capable of working at least ten hours per week subject to certain limitations. The particular job which Mr. Wolfe performed at Dick Leonard Ford did not require him to work more than ten hours a week, or to exceed the limitations which the majority of physicians would have imposed upon him.

Whether Mr. Wolfe's other impairments further limited his ability to work was also the subject of some conflict. Mr. Wolfe believes that they did, and that the ALJ's analysis failed to take the combined effect of his impairments and his own complaints of pain into consideration when he denied disability. Mr. Wolfe's argument unfortunately comes too late, and is supported by too little.

The record shows that Mr. Wolfe has suffered from childhood asthma, gout, hypertension, non-insulin dependent diabetes, venous insufficiency in the lower extremities with a history of thrombophlebitis, and a degenerative condition of the cervical spine, a condition which Mr. Wolfe identified as arthritis in the neck. With the exception of the latter, all were diagnosed as mild, and were either well-controlled by medication or have required no recent treatment.

The evidence relating to Mr. Wolfe's neck condition was sketchy at best. In 1982, X-rays showed advanced degenerative changes in Mr. Wolfe's cervical spine with evidence of disc degeneration. On November 17, 1982, he underwent a cervical laminectomy in an attempt to alleviate the related pain. His condition improved and he returned to work. When the pain recurred in November 1983, he consulted a chiropractor, Dr. James Sigler. Although Mr. Wolfe's condition improved following therapy, Dr. Sigler opined that the improvement might be only temporary and suggested that an impairment rating be completed within six to ten months. (A.R. 189–90). If an impairment rating was ever completed, it was never made a part of the record.

In response to questions posed by Mr. Wolfe's attorney almost five years later, Dr. Sigler's associate, Dr. Ronald Sigler, indicated that Mr. Wolfe's neck problems were moderate, that he was at maximum medical improvement, and that he could work for eight hours while standing or sitting with several restrictions. (A.R. 271). Those restrictions included: lifting more than twenty-five pounds, doing anything that involved working with hands over the head, extreme ranges of motion with the neck and head, or constant static posture of the head and neck. (A.R. 283).

In 1989, Mr. Wolfe apparently sought the services of yet another chiropractor, Dr. Michael Williams. The nature, extent and duration of Dr. Williams' treatment is unknown. His letter of March 22, 1989 simply stated:

As you are aware, your current treatment is for pain and discomfort caused by extensive degenerative joint disease. The bilateral total knee replacements make it inadvisable for you to remain standing on your feet for more than just a few minutes at a time. Extreme muscle spasms in the neck and back are associated with your cervical laminectomy surgery and excerbate (sic) your spinal problem. Along with signs of arteriosclerotic heart disease, these problems make it impossible for you to continue your occupation as an auto-salesman.[6]

6. Dr. Williams provided two written statements.

The second, a letter dated September 21, 1989, is

(A.R. 314). The ALJ found that Dr. Williams was not an acceptable medical source under Social Security Regulations, 20 C.F.R. § 404.1513, and accorded his statements little weight. *But see, Poole v. Railroad Retirement Bd.*, 905 F.2d 654, 662 (2d Cir.1990) (leaving unresolved issue of whether chiropractors considered "treating physicians"); *Santiago v. Bowen*, 715 F.Supp. 614, 615–16 (S.D.N.Y.1989) (applying "treating physician rule" to chiropractors). Mr. Wolfe does not challenge that determination.

The only other evidence relating to Mr. Wolfe's neck condition came from Dr. Reddy. During the course of her examination in December 1989, Dr. Reddy found that Mr. Wolfe had some decreased range of motion in the neck and some weakness of motor grip in the left hand as a result of the cervical laminectomy in 1982. (A.R. 327). She concluded, however, that Mr. Wolfe could still perform light work for up to ten hours a week. (A.R. 328, 331).

The ALJ considered the evidence before him, and the lack of any current medical evidence relating to Mr. Wolfe's various other impairments, and found that Mr. Wolfe retained the residual functional capacity to perform his job at Dick Leonard Ford. His findings are amply supported by the record.

### C. Complaints of Pain

As one final matter, we need to address Mr. Wolfe's contention that the ALJ failed to properly evaluate his complaints of pain. Our review of the record indicates that there was very little to evaluate.

At the first hearing Mr. Wolfe clearly stated that he was not experiencing any pain in his knees. While he indicated that his knees did become "sore" if he did too much, his primary concern seemed to be a fear of falling. Mr. Wolfe indicated, however, that he could walk without assistance for ten to fifteen blocks, that he rode an exercise bike for twenty minutes every morning, and played golf two months prior to the hearing.

At the second hearing on February 23, 1990, Mr. Wolfe's testimony changed dramatically. He made few references to his knees and focused instead upon his neck and a

circulatory problem in his legs. Mr. Wolfe stated that he could stand for only twenty to thirty minutes before his legs cramped due to poor circulation, that his neck was tight and "hurt all the time"; and that he experienced frequent headaches and was easily fatigued.

The ALJ found Mr. Wolfe's testimony at the second hearing to be self-serving and exaggerated, and accorded it little if any weight. The evidence supports that determination.

To establish disability based on subjective complaints, a claimant must show:

> 1) evidence of an objectively adduced abnormality *and, either* 2) objective medical evidence supporting the subjective complaints issuing from that abnormality, *or* 3) that the abnormality is of a nature in which it is reasonable to conclude that the subjective complaints are a result of that condition.

*Veal*, 833 F.2d at 698; *see also Sparks v. Bowen*, 807 F.2d 616, 618 (7th Cir.1986). Mr. Wolfe has failed to meet that burden. His testimony at the first hearing was limited almost entirely to the condition of his knees. There were no subjective complaints of pain, only references to the fact that his knees became sore if he did too much and that he was afraid of falling. Mr. Wolfe's subjective complaints at the second hearing were not supported by current objective medical evidence which would have shown a deterioration of his condition since the first hearing. Under the circumstances, it was not unreasonable for the ALJ to conclude that Mr. Wolfe's complaints were exaggerated, and certainly not "patently wrong." *See Kelley*, 890 F.2d at 964–65; *Imani on Behalf of Hayes*, 797 F.2d at 512.

### IV. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to the Secretary is

**AFFIRMED.**

---

totally illegible. (A.R. 320). The ALJ indicated in his decision of March 26, 1990 that the Sep-

tember letter merely repeated Dr. Williams' earlier statements.