142 F.3d 439
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Rex BORTON, Plaintiff-Appellant,
v.
Kenneth S. APFEL, Commissioner of the Social Security
Administration, Defendant-Appellee.
 No. 96-4233.
 United States Court of Appeals, Seventh Circuit.
 Argued October 24, 1997.
Decided May 4, 1998.
 
 Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. No. 3:95-CV-325 RM, Robert L. Miller, Jr., Judge.
 Before Hon. JOHN L. COFFEY, Hon. FRANK H. EASTERBROOK, and Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Rex Borton applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), claiming that he had been disabled since September 30, 1989, the last date on which he had been insured for DIB. The Social Security Administration denied his application. After a hearing, the Administrative Law Judge (ALJ) found that Borton was disabled as of May 24, 1991 when his right foot was crushed, and therefore was entitled to receive SSI after that date. The ALJ rejected Borton's claim for DIB, however, finding that Borton was neither physically or mentally disabled as of September 30, 1989, the last date on which he was insured for DIB. Borton appealed the ALJ's determination regarding DIB, but the Appeals Council denied the request for review, concluding that the ALJ's decision was fully supported factually and was in accord with the applicable law and its implementing regulations. Borton then sought review of the Administration's denial of DIB in federal court under 42 U.S.C. § 405(g), but the district court upheld the denial. Borton appeals, and we affirm the Administration's determination.
 
 I.
 
 2
 Borton argues that the denial of disability benefits was erroneous because, as of September 30, 1989, he had severe mental impairments including depression, personality disorder, somatoform disorder and substance addiction disorder. (He does not contend that any of his physical ailments as of September 30, 1989 warranted disability benefits.) His medical records reflect the following information related to possible mental impairments.
 
 
 3
 On February 1, 1987, Borton was admitted to Kingswood Hospital for depression and hostile impulses. Borton and his wife were experiencing marital difficulties and had separated, and Borton was unemployed and had been drinking prior to admission. Upon examination, Borton was oriented as to time, place, and person, and displayed intact judgment and coherent verbalization without psychotic features. He was discharged at his own insistence two days later against medical advice. The final diagnosis was dysthymia, or chronic mild depression.
 
 
 4
 Borton was admitted to Kingswood again in May of that year. Upon admission, he expressed homicidal fantasies and said that following a dispute with a girlfriend, he drank alcohol and took amphetamines, then went to his boss's house where he became upset and eventually "blew," threatening to kill someone with a gun after work materials were not ready and his truck transmission broke down. Borton gave his doctor a history of alcohol and substance abuse beginning with occasional drinking at age seven that became much heavier and included drug use in his late teens. He told his attending physician, Dr. Morrison, that in 1967 he shot a man in Indiana and spent seven years in prison, and that in 1976 he shot and killed another man while under the influence. His use of drugs and alcohol continued to increase over the next ten years. Although Borton described numerous arrests and negative effects on his family and married life, he repeatedly stated that his substance abuse had not affected his ability to hold a job.
 
 
 5
 Dr. Morrison evaluated Borton's mental status on admission and observed that he had difficulty maintaining attention and accurately perceiving or "hearing" questions, and displayed pressured speech. Borton reported a sensation of "speeding" during stressful situations. Dr. Morrison also noted that the patient appeared manipulative and attempted to affect the evaluation. Although Borton was oriented, his ability to reason (identifying similarities and interpreting proverbs) was poor, as also were his judgment and his memory. He displayed evidence of confabulation (filling in memory gaps by making things up) and obsessive anxieties related to financial and family pressures. Borton was released after one week with a final diagnosis of (1) Wernicke-Korsakoff psychosis (a condition in which the patient confabulates in an attempt to compensate for short-term memory problems caused by drinking); (2) substance abuse; (3) sociopathic personality disorder; and (4) hepatomegaly (enlarged liver).
 
 
 6
 Borton's most recent treatment for mental disorder was in July 1988, when he was admitted to Kingswood Hospital for five days. His diagnosis upon admission was alcohol dependence and bipolar disorder. The records related to this admission consist only of a one-page admission record, and do not contain any elaboration of any medical support for the diagnoses.
 
 
 7
 Once Borton had filed for Social Security benefits, three non-treating doctors evaluated his mental impairments. He was first examined by Dr. Berkson in January 1993, at the request of the Indiana Department of Human Services. After administering a mental status exam, Dr. Berkson concluded that Borton was approximately oriented and gave no indication of delusions or psychotic ideation. Borton was able to do serial sevens quickly and rapidly and was able to remember information given to him. Dr. Berkson noted that Borton's complaints of memory problems seemed "more apparent than real." In light of Borton's history of drug and alcohol abuse, Dr. Berkson believed that Borton may have been minimizing his current use of substances. (Borton reported having cut back significantly on his drinking.). Dr. Berkson diagnosed Borton as suffering from alcohol dependence by history and a personality disorder not otherwise specified.
 
 
 8
 In April 1993, Dr. J. Pressner, a psychological consultant retained by the state agency, evaluated Borton's mental disabilities on the basis of his medical records. Dr. Pressner completed a Psychiatric Review Technique Form (PRTF) that appears to focus particularly on Dr. Berkson's records and Borton's descriptions of his activities on an average day, as reported in December 1992. Dr. Pressner also noted Borton's earlier medical records, however, including the 1987 diagnosis of dysthymia. Dr. Pressner considered the extent of impairment in three categories--affective disorders, personality disorders, and substance addition disorders--and concluded that the impairments noted in the records did not limit Borton's activities or ability to function in any way. Dr. Pressner checked a box on the PRTF indicating that it was intended as a current evaluation of Borton's disabilities.
 
 
 9
 Finally, in May 1994, Borton was seen at the request of his lawyer by Dr. Norman Kerr, who conducted several psychological examinations. The psychological status examination showed that Borton was oriented and in contact with reality, displayed adequate common sense and memory, and had a low average ability to engage in abstract thinking as demonstrated by his ability to interpret proverbs. Dr. Kerr reported that the results of the Bender Visual Motor Gestalt Test were adequately organized and free from significant errors or distortions.
 
 
 10
 Dr. Kerr then gave Borton two personality tests, the Minnesota Multiphasic Personality Inventory (MMPI) and the Cornell Psychiatric Index. The MMPI includes a validity indicator, and Borton's score on this showed a slight exaggeration of his problems. Dr. Kerr attributed this exaggeration to Borton's "acute turmoil" and "his cry for help," but did not elaborate on these descriptions. Dr. Kerr stated that otherwise, the clinical scales reliably reflected Borton's current state of mind. Borton's scores were abnormally high on seven of the ten scales, suggesting "multiple psychopathologies." The highest scores were on scales 1 and 8, most common for people who (1) have physical complaints that are vague and medically atypical, or (2) have periods of confusion and disorientation marked by strange thoughts and behaviors. The Cornell Psychiatric Index, which has no validity indicators, reflected Borton's feelings of fear and inadequacy; pathological mood reactions, especially depression, anxiety, and nervousness; psychosomatic symptoms; and "troublesome psychopathy" (no details given). Dr. Kerr concluded that Borton displayed the "long-term presence of maladaptive personality traits," and had "other mental disorders" causing significant functional impairment. His final diagnosis was alcohol, cannabis and nicotine dependence; bipolar disorder, mixed;[1] somatoform pain disorder; and personality disorder not otherwise specified. Dr. Kerr also completed a PRTF opining that as of May 1994, Borton's mental impairments were severe enough to meet the Social Security Administration's presumptive disability listings in the following categories: affective disorders, somatoform disorders, personality disorders, and substance addiction disorders. According to Dr. Kerr, these impairments markedly or frequently limited Borton's activities and ability to function. In June 1994, Dr. Kerr completed a Mental Residual Functional Capacity Assessment (MRFCA) that amended his previous evaluation. The amended assessment was intended to cover both Borton's current mental state and his state as of September 30, 1989. In this MRFCA, Dr. Kerr found Borton "markedly limited" in the majority of his abilities to concentrate and perform normal work tasks, interact appropriately with others, and adapt to changes in his work or other environment.
 
 
 11
 The ALJ found that Borton was not disabled before September 30, 1989. Although Dr. Kerr opined that Borton was severely mentally impaired prior to September 30, 1989, the ALJ found that Dr. Kerr's opinion was not consistent with the medical records or the other medical experts. Further, although the ALJ found evidence of alcohol and substance dependence, he concluded that it was not at a level that would be considered disabling in itself. The ALJ noted that Borton consistently stated that his substance abuse did not interfere with his ability to work, and there was no evidence to the contrary. The ALJ found that although dysthymia and some personality disorder were present, Borton's mental impairments imposed no restrictions on his activities of daily living, and only slight difficulties on his social functioning; seldom caused deficiencies of concentration, persistence or pace; and had never resulted in episodes of deterioration or decompensation at work. The ALJ thus found that Borton's mental impairments were not severe as of September 30, 1989 and denied his application for disability benefits.
 
 
 12
 Borton exhausted his administrative remedies and then filed an action for judicial review in the district court. The district court entered summary judgment in favor of the defendant, and Borton appeals.
 
 II.
 
 13
 An individual is entitled to disability benefits under the Social Security Act if he can establish that he is disabled, that is, unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, an ALJ addresses five questions in sequential order: (1) whether the claimant is presently employed; (2) whether the claimant's impairment or combination of impairments is severe; (3) whether the impairments meet or exceed any of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which the Social Security Commissioner acknowledges to be conclusively disabling; (4) whether the claimant's impairments limit his residual functional capacity to the point that he is no longer able to perform his former occupation; and (5) whether the claimant is unable to perform any other work in the national economy given his age, education and work experience. Brewer v. Chater, 103 F.3d 1384, 1391 (7th Cir.1997). A negative answer at any point other than Step 3 halts the inquiry and leads to a determination that the claimant is not disabled. Id . The ALJ here stopped the inquiry at Step 2, concluding that Borton had not established that he suffered from a "severe impairment" before September 30, 1989.[2] On appeal, Borton contends that his mental impairments met the requirements of Step 2 as of September 30, 1989.
 
 III.
 
 14
 Our review of the ALJ's findings is deferential. The ALJ's findings are conclusive if supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brewer, 103 F.3d at 1390 (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In making determining whether substantial evidence exists, we review the entire administrative record, but we do not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the ALJ. Id.
 
 
 15
 Borton first claims that the ALJ made an error of law, because disability claimants need only demonstrate a "de minimis" level of severity in their impairments to survive Step 2, and the ALJ applied a higher standard to his claim. Borton's support for his contention that a "de minimis" standard applies at Step 2 is a portion of the Supreme Court's opinion in Bowen v. Yuckert, 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), in which the Court alluded to the argument presented by Yuckert, the claimant. However, the Court never approved or adopted Yuckert's "de minimis" argument; it merely mentioned it. No Supreme Court imprimatur can be drawn from this passing reference.
 
 
 16
 Moreover, it is clear that the correct standard was applied. An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among other things: understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is not severe if the "medical evidence establishe[s] only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Titles II and XVI; Medical Impairments That Are Not Severe, S.S.R. 85-28 (Cum.Ed.1985). The ALJ found that although Borton had some mental impairments, they imposed only minimal limits on his functioning and ability to perform work activities. The ALJ thus applied the correct standard. Finding no error of law, we turn to an examination of whether the ALJ's finding of non-severity is supported by substantial evidence in the record.
 
 
 17
 After reviewing the entire administrative record, we find substantial support for the ALJ's conclusion that Borton's mental conditions created, at most, slight restrictions on his ability to perform basic work activities. Mental status examinations, including the one by Dr. Kerr, consistently demonstrated that Borton could understand, remember and carry out simple instructions, and exercise common sense judgment. With one exception, nothing in either the medical records or Borton's own accounts of his work record shows any particular difficulty in responding appropriately to supervisors, co-workers, and his usual work environment. Borton makes much of the one exception, an episode in which Borton consumed quantities of drugs and alcohol and then "blew" while at his boss's house to pick up materials, but it is clear that the episode is an aberration in Borton's overall reported work history, which shows no other similar episodes. Although the record documents a lifelong substance abuse problem, Borton himself repeatedly stated that his substance abuse did not interfere with his ability to work. Finally, the medical records for the psychological treatment Borton received before September 30, 1989 reflect only short-term treatment for substance abuse and depression, after which Borton was released to full activity. The sum of this evidence sufficiently supports the ALJ's finding of non-severity.
 
 
 18
 Borton argues that his alcoholism was itself a severe mental impairment. Certainly, the record is rife with evidence of Borton's alcoholism. Nevertheless, our task on appeal is not to reweigh the evidence, but to determine whether there is substantial evidence in the record to support the ALJ's findings. Here, the ALJ found that although Borton drank copiously, the drinking had not affected his ability to work and he was able to control the degree of his drinking when he wished. The record supports these findings. Borton himself testified that he had never lost a job because of drinking, and there is no suggestion in the record that Borton's drinking ever interfered with his ability to get or keep a job. Borton also testified that he voluntarily reduced his drinking in 1989 when he began living with a girlfriend. (Borton reports in 1991 that he reduced his drinking and his over-indulgence has not been a problem for the last two years) We agree with the findings of the ALJ and hold that he did not commit error in concluding that Borton's alcoholism did not significantly limit his ability to perform basic work skills as of September 30, 1989.[3]
 
 
 19
 Borton also raises a flurry of criticisms against the ALJ's discounting of Dr. Kerr's opinions as not credible in favor of the opinions of Dr. Pressner and others. Borton concedes that an ALJ is entitled to make credibility determinations when faced with conflicting medical evidence, and that this court may not disturb those determinations unless they are patently wrong. See Wolfe v. Shalala, 997 F.2d 321, 326 (7th Cir.1993). Nevertheless, he argues that the ALJ wrongly credited Dr. Pressner's opinion and discredited Dr. Kerr's because: Dr. Pressner's PRTF was marked "current evaluation" (although he clearly considered and relied upon the pre-1989 medical records), while Dr. Kerr amended his PRTF to state that it was intended to cover both Borton's pre-1989 and current mental health; Dr. Pressner did not examine or treat Borton, whereas Dr. Kerr at least examined him; and Dr. Kerr's opinion was more consistent with the pre-1989 medical records than Dr. Pressner's opinion. None of these arguments is persuasive, nor do they demonstrate that the ALJ's credibility determination was patently wrong. See id. An ALJ is merely required to minimally articulate his reasons for his findings, Nelson v. Apfel, 131 F.3d 1228, 1237-38 (7th Cir.1997), and we are satisfied that the ALJ adequately did so here. To give only one example, Dr. Kerr's report contained opinions not supported by any medical evidence, such as a severe bipolar disorder. The only medical record reflecting such a diagnosis was a one-page admission record for Borton's July 1988 detoxification that provided no details or supporting documentation for the diagnosis. Even Dr. Kerr's own PRTF fails to note any evidence of bipolar disorder; instead, Dr. Kerr merely lists severe bipolar disorder among other conclusions, possibly relying on the July 1988 record without any independent analysis. The ALJ's discounting of Dr. Kerr's opinions due to credibility issues is not simply the personal belief of an ALJ "playing doctor", it is supported by substantial evidence in the record.
 
 
 20
 Borton next argues that the ALJ erred by not seeking an independent retroactive medical opinion, as is recommended by Social Security Ruling 83-20 when the date of onset of the disabilities is at issue. See Titles II and XVI: Onset of Disability, S.S.R. 83-20 (Cum.Ed.1983). This argument is misdirected. The "date of onset" refers to the date when "the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity]" for at least 12 consecutive months. Id. As the ALJ found that Borton's mental impairments had not reached the necessary severity as of September 30, 1989, the date on which he was last insured for disability, there was no "date of onset" to be determined and thus no need for an independent retroactive medical opinion. Moreover, this argument is based on a flawed premise--that Dr. Berkson's and Dr. Pressner's evaluations of Borton did not cover his pre-1989 mental state, and thus were not "retroactive," because Dr. Pressner's PRTF had the box for "current evaluation" checked, and Dr. Berkson's evaluation did not state what time frame it covered. (Dr. Kerr submitted an amended form clarifying that his PRTF was intended to cover both Borton's pre-1989 state and his current mental state.) The evaluations themselves make clear, however, that all three non-treating doctors, Dr. Berkson, Dr. Pressner, and Dr. Kerr, took all of Borton's relevant medical records into account when reaching their opinions, including those relating to the pre-1989 period. Thus, all of these doctors' reports show the necessary "retroactivity" to serve as a basis for the ALJ's opinion. We disagree with Borton's assertion and are convinced that there was no need for the ALJ to seek yet another "retroactive" opinion.
 
 
 21
 Finally, Borton contends that the ALJ improperly dismissed accounts in medical records that Borton had shot one person in 1967 and shot and killed another in 1976, simply because the accounts were based on Borton's own self-reports to medical personnel, not independent sources. This argument does not undermine the ALJ's conclusion that Borton had no severe mental impairments, however. Assuming the truth of Borton's reports of his own violence, a propensity for occasional violence, even extreme violence, does not qualify as mental illness. None of Borton's physicians have pointed to these incidents as a basis for any diagnosis of mental impairment. It would have been presumptuous for the ALJ to have found a severe mental impairment without any supporting documentation other than these incidents and in particular when no medical expert has done so.
 
 
 22
 In sum, the ALJ's determination here met all the requirements.[4] The ALJ more than minimally articulated the reasons for his determination of no severe impairment. Although there is evidence in the record contrary to the ALJ's determination, a reasonable mind could certainly find that the evidence he relied upon was sufficient to support his determination. Brewer, 103 F.3d at 1390. We AFFIRM the judgment of the district court.
 
 
 
 [1]
 Dr. Kerr's basis for this diagnosis is not apparent from the record. On the PRTF Dr. Kerr submitted, he did not note that bipolar syndrome was present in Borton
 
 
 [2]
 The district court initially misapprehended the ALJ's focus on Step 2, believing instead that the ALJ had continued the inquiry to Step 4 or 5. Upon a motion for reconsideration, the district court issued another order correcting its mistake and limiting its inquiry to Step 2, and again concluded that substantial evidence supported the ALJ's determination that Borton's mental impairments were not severe as of September 30, 1989. The district court's initial mistake does not affect our inquiry here; we review the ALJ's determination on the entire record, just as the district court did, effectively making our review of the district court's decision de novo. See Peterson v. Chater, 96 F.3d 1015, 1016 (7th Cir.1996)
 
 
 [3]
 As substantial evidence supports the ALJ's determination that Borton's mental impairments do not meet the severity requirements of Step 2, we do not consider whether the recent amendments to the Social Security Act, which bar the award of SSI benefits for substance abuse-based disabilities, would apply to this case. See Contract with America Advancement Act of 1996, Pub.L. 104-121, 110 Stat. 847, 852-53 (codified at 42 U.S.C. § 423(d)(2)(C))
 
 
 [4]
 Our review of the record and the ALJ's well-reasoned opinion reveals no basis for Borton's assertion that the ALJ did not perform the "careful evaluation" required by Social Security Ruling 85-28