Constance BREWER, Plaintiff,

v.

Shirley CHATER, Commissioner of the
Social Security Administration,[1]
Defendant.

No. 94 C 7625.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 22, 1995.

1. Effective March 31, 1995, the Commissioner of Social Security assumed the function of the Secretary of Health and Human Services in social security cases. In accordance with Section 106(d) of P.L. No. 103–296, Shirley S. Chater, the Commissioner of Social Security, has been substituted for Donna Shalala, the Secretary of Health and Human Services, as the defendant in this case.

Daniel Robert Bourke, Law Office of Daniel Bourke, Chicago, IL, for plaintiff.

Ann L. Wallace, United States Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Plaintiff, Constance Brewer, applied for a period of disability and Disability Insurance Benefits on February 12, 1992. Her claim was denied initially and upon reconsideration by state agency personnel. After a hearing, Administrative Law Judge ("ALJ") Donald C. Niersbach ruled that Ms. Brewer had a residual functional capacity for light work enabling her to perform her past work and other work existing in the economy. The Appeals Council denied Ms. Brewer's request for review. On December 22, 1994, Ms. Brewer brought the present action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Health and Human Services ("Commissioner"). Both parties have filed motions for summary judgment. For the reasons set forth below, the Commissioner's motion is granted, and Ms. Brewer's motion is denied.

### Facts

At the time of the hearing before the ALJ, Ms. Brewer was sixty years old and lived with her daughter. Tr. 172, 209. Also living in the same household was another daughter and her two children. Tr. 199. Ms. Brewer completed high school as well as training with H & R Block to be a tax preparer. Tr. 172. Ms. Brewer opened a clothes cleaning business in 1965. Tr. 177. She managed the business, did the dry cleaning, handled the press machine, kept the books, operated the cash register and delegated certain tasks to a seamstress and her children. Tr. 176–78, 232. At the hearing, Ms. Brewer asserted that working at her dry cleaners required her to stand constantly and to lift 20–30 pounds. Tr. 179–80.[2] Ms. Brewer testified that she closed her business in April, 1992 because operating it became too strenuous for her. Tr. 173–74, 181, 215.

Ms. Brewer testified that she was employed by H & R Block as a tax preparer three months a year from 1974 through 1979, for which she was paid $50 per week. Tr. 182, 213. From 1980 to the present, she has operated her own tax preparation business during tax season, completing short forms for customers and grossing $1000 annually. Tr. 182–84. Since April, 1992 when she shut down her laundry business, Ms. Brewer has not applied for any job or received any type of pension or unemployment compensation, and her daughter has paid her living expenses. Tr. 174–75, 202–03.

Ms. Brewer is five feet tall and weighs two hundred pounds. Tr. 173. She testified that she first noticed pain in her chest approximately two years prior to the hearing date and felt a throbbing-like chest pain during the hearing. Tr. 185–86, 194, 202. Ms. Brewer does not experience chest pain while lying in bed, can sit without any problem and stand five to ten minutes at a time. Tr. 195. At one point in the hearing she said that she can walk about one and one-half blocks before becoming short of breath, and at another point she stated that she is able to walk about one-half block before wheezing. Tr. 185, 195.

Ms. Brewer has full use of her hands most of the time but is not capable of lifting anything heavier than a gallon of milk. Tr. 196,

---

2. Ms. Brewer's exact testimony was as follows:
   Q. ... And what was it that you had to lift in pounds, if you can tell me?
   A. Well, I don't know. I'm trying to think now. You put in—I would put, what, 20 to 30 pounds on one side. You pull that out. It is wet. Okay. To put them in the dryer. Then you do the same thing. You turn the machine over, then you do the same thing on the other side. And it's wet. So, usually 30 pounds on one side, and 30—that's about 60 pounds. Tr. 180.

198. She has full use of her feet and can bend at the waist, climb about six steps at a time and reach over her head. Tr. 200–01. Ms. Brewer testified that she is diabetic and tests her blood sugar every morning. Tr. 203. Ms. Brewer's medications include nitroglycerine pads, Vaseretic 10/25, Nitrostat, DiaBeta, Theophylline and aspirin. Tr. 190–93, 196–97.[3] About five seconds after Ms. Brewer takes a Nitrostat tablet, her chest pain is relieved. Tr. 193–94. Ms. Brewer testified that she was hospitalized for two days in March 1993 at Holy Cross Hospital after falling while walking. Tr. 188.

Ms. Brewer testified that she goes to bed around 10:00 p.m. and during the night occasionally wakes up and sometimes gets out of bed to use the bathroom. Tr. 203–04. Ms. Brewer does a little housecleaning each day, including dusting and making her bed, and prepares and eats three meals a day. Tr. 205–07. Ms. Brewer does not vacuum, sweep, mop or do outside work on her house. Tr. 207–08. She sometimes listens to the radio, seldom watches television and never reads. Tr. 205–06. Ms. Brewer drives without limitation, although she has disabled plates on her car, and shops for groceries. Tr. 196, 208. She attends church twice a week and acts as a missionary with some of the women in the congregation, which involves visiting ill people once a week. Tr. 207–08. Ms. Brewer's hobby is crocheting; and she does not do any regular exercise, smoke or drink alcohol. Tr. 209–10. Ms. Brewer's nephew drove her to the hearing, and she planned on taking the bus home. Tr. 210–11.

In the Disability Report Ms. Brewer completed in February, 1992, she stated that she suffered from high blood pressure and a heart condition. Tr. 48–49. She wrote that she was unable to work seven hour days in her cleaners because her heart and pulse would beat quickly, she became tired and dizzy, she walked into things and lost her balance. Tr. 48. Operating the dry cleaners required Ms. Brewer to carry about two to three pounds of clothes at a time thirteen feet from the presser to the counter. Tr. 53. Moreover, the heaviest weight she lifted was ten pounds, and she frequently lifted ten pounds. Tr. 53. During a typical day, she engaged in constant reaching and frequent bending, sat for four hours, stood for six hours and walked for one hour. Tr. 53. Ms. Brewer noted that since June, 1982, Dr. Pranau Vaidya, an internal medicine specialist whose practice consists of direct patient care, has been her treating physician whom she visits one time each month. Tr. 49, 67. In August, 1992, Ms. Brewer supplemented her Disability Report, stating that she had become a diabetic for which she was taking Micronase, and that she was often drowsy and slept a lot.

The medical records produced at the hearing indicate that Lee Behnke, a Disability Claims Examiner, had a telephone conference with Dr. Vaidya on March 25, 1992, a few days after Dr. Vaidya saw Ms. Brewer. Dr. Vaidya described Ms. Brewer as "somewhat obese" at five feet two inches tall and two hundred and eight pounds and diagnosed Ms. Brewer as having mild to moderate hypertension, angina and arthritis. Tr. 64–65. The arthritis mostly affected Ms. Brewer's lower back, but she had not lost any motion in this area. Ms. Brewer did not suffer from any end-organ damage, reflex abnormalities, sensory deficits or motor loss. Tr. 64. The angina caused Ms. Brewer to experience about once every two weeks retrosternal pain radiating to her left arm, which she characterized as a feeling of pressure. Tr. 64. This symptom was associated with exertion. Tr. 64. Ms. Brewer did not have a history of a myocardial infarction. Tr. 64. Dr. Vaidya stated that he had never performed a treadmill exercise test and did not have an EKG on her. Tr. 64. He informed Mr. Behnke that at the last visit Ms. Brewer's blood pressure reading was 140/96, and her previous two blood pressure readings were in the mild to moderate range. Tr. 64.

Mr. Behnke requested a resting ECG, which was completed May 13, 1992. Tr. 68–69. Hilton Gordon, M.D., interpreted the ECG as showing normal sinus rhythm with a rate of 80, normal PR and QRS intervals,

---

**3.** The transcript is unclear as to whether Ms. Brewer was taking the full amount of medicine prescribed. Tr. 191–93.

nonspecific ST–T wave changes in the infero-lateral leads and poor wave progression in V1 and V2. Tr. 69. A state agency physician also reviewed the ECG and concluded it was "abnormal" on the basis of the nonspecific T-wave changes. Tr. 68. On June 19, 1992, Mukesh C. Jain, M.D., tried to conduct an exercise ECG also in response to Mr. Behnke's request. Ms. Brewer walked for three minutes and achieved a heart rate of 138/minute, and the test was then discontinued because of the inappropriate increase in Ms. Brewer's blood pressure while exercising at a low level. Tr. 73. During the attempt to give the test, Ms. Brewer complained of discomfort in her chest. Tr. 73. Dr. Jain's impression was that the test was inconclusive because of Ms. Brewer's inability to attain the target heart rate, and he recommended a thallium exercise test. Tr. 73. A state agency physician interpreted the test to be negative at 5 METS or less. Tr. 72.

In June, 1992, Young–Ja Kim, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment of Ms. Brewer. Tr. 84–92. Jimenez Francisco, M.D., another agency physician, completed a second Residual Physical Functional Capacity Assessment in December, 1992. Tr. 100–108. Both doctors concluded that Ms. Brewer was capable of occasionally lifting and/or carrying fifty pounds and frequently lifting and/or carrying twenty-five pounds; standing and/or walking for a total of about six hours in an eight-hour workday; sitting for a total of about six hours in an eight-hour workday; and pushing and/or pulling in unlimited amounts. Tr. 85, 101. Ms. Brewer experienced no manipulative, visual, communicative or environmental limitations. Tr. 86, 89, 103–104. She was able to frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl but could never climb a ladder, rope or scaffolds. Tr. 87, 102. Dr. Kim noted that Ms. Brewer suffered from chest pain, or angina, as well as arthritis. Tr. 91. He also noted that Ms. Brewer did not experience any focal neuro deficits. Tr. 91. Dr.

Francisco additionally commented that Ms. Brewer had hypertension. Tr. 107.

Dr. Vaidya provided cardiac, arthritic and diabetic reports dated November 27, 1992. Tr. 94. As of that date, his most recent examination of Ms. Brewer was on October 29, 1992. Tr. 94. At that time, Dr. Vaidya's diagnosis of Ms. Brewer's condition was hypertension, arthritis and diabetes. Tr. 94. Ms. Brewer still did not suffer from end organ damage or myocardial infarction but experienced chest pain. Tr. 94. The chest pain, which now occurred three times per week, felt like a dull ache, was precordial, lasted a few seconds, was precipitated by walking or physical work and was relieved by rest and nitroglycerin or other vasodilators. Tr. 95.

On February 19, 1993, Ms. Brewer was taken by paramedics to the emergency department of Holy Cross Hospital. Tr. 125. Dr. E. Cambry recorded that at approximately 5:00 p.m. that day, Ms. Brewer felt dizzy, was short of breath and nauseous, went to the bathroom and fell. Tr. 125. Ms. Brewer stated that she did not pass out and no one witnessed her fall. Tr. 125. Dr. Cambry noted Ms. Brewer's history of diabetes, asthma and hypertension and medications of Micronase, Theo–Dur and Vasotec. Tr. 125. Dr. Cambry assessed Ms. Brewer's condition as "dizziness rule out myocardial infarction" and admitted her to the telemetry unit for testing. Tr. 125. Among the tests completed were a chest x-ray, which did not show congestive heart failure or that Ms. Brewer's lungs had infiltrates, and a 24–hour Holter[4] report, which did not indicate any ventricular tachy-arrhythmias or brady arrhythmias. Tr. 129, 132. When Ms. Brewer was released on February 22, 1993, her condition was stable. Tr. 155.

The ALJ called upon Dr. Jakub G. Schlizhter to testify at the hearing. Tr. 217. Dr. Schlizhter is certified in medicine and cardiovascular disease. Tr. 217. From the records submitted, Dr. Schlizhter could not say that Ms. Brewer was disabled under the

4. A "Holter" monitor is "a technique for long-term recording of electrocardiographic signals continuously on magnetic tape, and replaying it at rapid speed, for scanning and selection of significant but fleeting changes that might otherwise escape notice." Stedman's Medical Dictionary 885 (5th ed. 1982).

regulations. Tr. 237–39. Dr. Schlizhter testified that Ms. Brewer suffers from diabetes and hypertension, and when exerting herself, blood pressure elevation and chest pain. Tr. 224, 226. He confirmed that the May 13, 1992 resting electrocardiogram was abnormal, showing a left heart strain and left ventricular hypotrophy. Tr. 225, 227. A thallium exercise test would indicate if her heart muscle is diseased and, therefore, whether Ms. Brewer is disabled. Tr. 224, 226–27, 236. Based upon Ms. Brewer's testimony that Holy Cross Hospital performed tests during her stay, Dr. Schlizhter thought that perhaps the records documenting that stay would indicate that a thallium exercise test had been performed. Tr. 225. Ms. Brewer's counsel agreed to send the hospital records to the ALJ so that he could forward them to Dr. Schlizhter with interrogatories. Tr. 226.

ALJ Niersbach also called upon Myer Klein, a vocational expert ("VE"), to testify at the hearing. Mr. Klein described Ms. Brewer's past work as the owner and operator of a laundry as requiring lifting from thirty to forty pounds, involving medium exertion and semi-skilled. Tr. 233. He categorized Ms. Brewer's work as a tax preparer as sedentary and semi-skilled. Tr. 233. Mr. Klein testified that Ms. Brewer is not qualified to work as a tax clerk or a county (most likely he meant accounting) clerk, but, from her past experiences as the operator of her own business and as a tax preparer at H & R Block, she possesses the skills to be a general clerical worker (3,000 jobs in the region), a posting clerk (2,000 jobs in the region) or cashier doing light (15,000 jobs in the region) or sedentary work (3,000 jobs in the region). Tr. 233–35.

### Discussion

#### A. Standard of Review

■ The Social Security Act ("the Act") provides for limited judicial review of final decisions of the Commissioner. The role of this court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. 42 U.S.C. §§ 405(g), 1383(c)(3); *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir.1993) (citations omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993) (citation omitted). In determining whether the Secretary's findings are supported by substantial evidence, the district court may not "reevaluate the facts, reweigh the evidence, or substitute [its] own judgment for that of the [Commissioner]." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994) (citation omitted). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir.1990) (citations omitted); *Edwards v. Sullivan*, 985 F.2d 334, 336–37 (7th Cir.1993).

After consideration of the entire record, ALJ Niersbach concluded that Ms. Brewer was not "disabled" within the meaning of the Social Security Act. Tr. 20. He found that Ms. Brewer has the residual functional capacity to do light work (which includes sedentary work) and that her previous job operating a laundry business constituted light work. Tr. 19–20. *See* 20 C.F.R. § 404.1520(e). The ALJ further concluded that the skills Ms. Brewer acquired as an entrepreneur and tax preparer would permit her to perform available jobs in the national economy. Tr. 18, 20. *See* 20 C.F.R. § 1520(f).

#### B. Sequential Evaluation

In order to qualify for Disability Insurance Benefits, a claimant must be disabled. *Pope v. Shalala, supra*, 998 F.2d at 477. The Act defines a "disabled" individual as one who is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 432(d)(1)(A); 20 C.F.R. § 404.1505. To satisfy this definition, an individual must have a severe impairment which makes her unable to perform her previous work or any other substantial gainful activity which exists in the national economy. 20 C.F.R. § 416.1505.

The Social Security regulations require the factfinder to follow a five-step inquiry to

determine whether a claimant is disabled. 20 C.F.R. § 404.1520. The Seventh Circuit has summarized the test as follows:

> The [Commissioner] must determine in sequence: (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing any work in the national economy. Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope v. Shalala, supra*, 998 F.2d at 477–78 (citing *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir.1992).

In the present case, ALG Niersbach applied the sequential evaluation and decided the case at Step Four. He found that Ms. Brewer presently has gainful employment by earning up to $1000.00 for preparing simple income tax reports three days per week during tax season; suffers from mild hypertension, arthritis, obesity, new onset diabetes mellitus, angina pectoris and back pain; does not have an impairment or combination of impairments listed in or medically equal to one listed in the applicable regulations; and retains the capacity for light work, which includes sedentary work, and therefore is capable of operating or working in a clothes cleaning business, bookkeeping or preparing tax forms. Tr. 20. Consequently, the ALJ found Ms. Brewer was "not disabled" within the meaning of the Act and the applicable regulations. Tr. 20.

■ Ms. Brewer argues that ALJ Niersbach erred in not finding her "disabled." She initially contends that the ALJ's conclusion that she is capable of performing her past work as the owner and operator of a dry cleaning business was not supported by substantial evidence.

### C. *Operating a Dry Cleaning Business is Light Work*

In deciding whether the ALJ's decision that Ms. Brewer retained the residual functional capacity to perform light work, including her past relevant work in a dry cleaning business,[5] was supported by substantial evidence, I am to evaluate all of the evidence. *Pope v. Shalala, supra*, 998 F.2d at 486. Ms. Brewer argues that the record does not support a finding that her work as the owner/operator of a dry cleaning business was light and that, in fact, it involved medium exertion. She also maintains that the ALJ failed to carefully consider the demands of her past work or make specific findings regarding her capacity to perform that work and, therefore, did not satisfy his duty under the applicable regulations and case authority.

■ "Light work" involves lifting no more than twenty pounds at a time, frequently lifting or carrying objects weighing up to ten pounds and a good deal of standing or walking, which the Social Security Administration considers to be a total of approximately six hours of an eight-hour workday, with sitting intermittently during the remaining time. 20 C.F.R. § 404.1567(b); S.S.R. 83–10. "Medium work," on the other hand, requires similar activities except that it involves lifting up to fifty pounds at a time and frequently lifting objects weighing up to twenty-five pounds. 20 C.F.R. § 404.1567(c). Ms. Brewer's assertion that a job requiring frequent bending is automatically considered medium work is erroneous. *See* Pl.'s Brf., p. 8 n. 4; Pl.'s Reply Brf., p. 4. Social Security Ruling 83–10 states that "[t]he considerable lifting required for the full range of medium work usually requires frequent bending-stooping." Thus, although medium work typically demands frequent bending, the fact that a job that 20 C.F.R. § 404.1567(b) defines as "light work" involves frequent bending does not render that job "medium work." *See Fox v. Heckler*, 776 F.2d 738, 743 (7th Cir.1985); *Rivera v. Secretary of Health and Human Services*, No. 93–1700, 1994 WL 107870, *7, n. 10 (1st Cir. March 23, 1994).

---

**5.** The parties apparently agree that Ms. Brewer's     past work as a tax preparer is not relevant.

Ms. Brewer stated in the Disability Report she filled out in February, 1992 that operating her cleaning business required her to carry two to three pounds of clothes thirteen feet from the presser to the counter. Tr. 53. She frequently lifted ten pounds, and ten pounds was the heaviest weight she lifted as well. Tr. 53. Moreover, she wrote that in an eleven hour work day,[6] she walked one hour, stood six hours, sat four hours and engaged in bending frequently and reaching constantly. Tr. 53. At the hearing before the ALJ, Ms. Brewer contradicted her assertions in the Disability Report by testifying that working in her dry cleaning business required her to lift twenty to thirty pounds and to stand constantly. Tr. 179–80. The VE, Myer Klein, testified to the ALJ that Ms. Brewer's past work in operating her cleaning business involved lifting thirty to forty pounds, an amount that he apparently deduced from Ms. Brewer's testimony that she operated a "30 or 40 pound [pressing] machine", Tr. 179,[7] and required medium exertion. Tr. 233. After weighing this evidence, ALJ Niersbach credited Ms. Brewer's statements in her Disability Report. Tr. 14, 18.

■ I am not to reweigh the evidence, substitute my judgment for that of the ALJ or "disturb a credibility finding unless it is 'patently wrong in view of the cold record.'" *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993); *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir.1989); *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir.1989). Therefore, "[t]he ALJ's reasonable resolution of conflicts in the evidence is not subject to review." *Kapusta v. Sullivan, supra,* 900 F.2d at 97; *see also Herr v. Sullivan,* 912 F.2d 178, 181 n. 4 (7th Cir.1990) ("The existence of an evidentiary dispute, in and of itself, does not present a ground for reversing the ALJ's decision to credit one particular version of the events over another."). ALJ Niersbach's decision to credit Ms. Brewer's earlier statements in her Disability Report, which qualify her job at

the dry cleaners as "light work," rather than her testimony before him and the VE's statement (which has questionable support in the record) is clearly not patently wrong in light of the cold record and therefore will not be upset.

### D. Ms. Brewer is Capable of Operating a Dry Cleaning Business

Ms. Brewer also argues that the ALJ did not sufficiently ascertain the demands of her past work in relation to her present physical capacity, *see Strittmatter v. Schweiker,* 729 F.2d 507, 509 (7th Cir.1984); *Nolen v. Sullivan,* 939 F.2d 516, 519 (7th Cir.1991), and, in particular, failed to make the findings of fact required by Social Security Ruling 82–62 regarding (1) her residual functional capacity; (2) the physical and mental demands of her past job; and (3) whether her residual functional capacity would permit a return to her past job. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991).

ALJ Niersbach discredited Ms. Brewer's testimony at the hearing as well as VE Klein's testimony and credited Ms. Brewer's Disability Report. In this way, he determined the demands of Ms. Brewer's past work. Tr. 14–15, 18, 19. The ALJ listed the demands of Ms. Brewer's work in owning and operating a dry cleaning business as including using cleaning machines, bookkeeping, giving orders to her son and grandchildren, carrying two to three pounds of clothing at a time from the presser to the counter (a distance of thirteen feet), bending frequently and reaching constantly. Tr. 14–15. Ms. Brewer worked eleven hour days, which were divided into walking one hour, sitting four hours and standing six hours. Tr. 14–15. Moreover, often there would be no customers, and Ms. Brewer could then do the books while sitting down. Tr. 18.

ALJ Niersbach also made factual findings as to Ms. Brewer's present physical condi-

---

**6.** Ms. Brewer seems to contradict herself in her Disability Report. At one point she states that she worked eleven hour days, and at another point, she apparently represents that her typical work day was seven hours. Tr. 48, 53.

**7.** It is not clear what Ms. Brewer meant by characterizing the press machine as "a 30–40

pound machine." I certainly cannot say that Ms. Brewer's testimony indicated that she was required to lift thirty to forty pounds each time she used the machine, especially because when asked how many pounds she was required to lift, she answered twenty to thirty pounds without referring to the press machine.

tion. He determined that although she suffers from mild hypertension, arthritis, obesity, new onset diabetes, angina pectoris and back pain, she has no end-organ damage and retains the capacity for light work. Tr. 19. His decision is supported by substantial evidence.

Dr. Vaidya, Ms. Brewer's treating physician, diagnosed Ms. Brewer's condition as hypertension, arthritis and diabetes. Tr. 94. The hypertension has not caused end organ damage or myocardial infarction but does produce chest pain. Tr. 65, 94. However, medication relieves the chest pain. Tr. 95. Ms. Brewer's arthritis affects her lower back, but she has not lost any motion in this area or suffered from reflex abnormalities, sensory deficits, motor loss, weakness, atrophy, inflammatory or systemic signs or structural changes including anatomical deformities, bone destruction or bone hypertrophy. Tr. 64–65, 96–97. Dr. Vaidya reported that Ms. Brewer complied with her diabetes therapy, and this condition has not caused her visual, retinal or vascular complications, abnormality in gait, station, dexterity or motor functions or any other symptoms. Tr. 98. Dr. Vaidya did not report that Ms. Brewer was limited in her ability to perform work-related activities such as "sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking [or] traveling." Tr. 95, 97, 98.

A 1993 chest x-ray did not indicate infiltrates in Ms. Brewer's lungs or congestive heart failure. Tr. 129. The 24–hour Holter report did not show any ventricular tachyarrhythmias or brady arrhythmias, and Ms. Brewer did not report any symptoms during the test. Tr. 132. Additionally, Drs. Kim and Francisco, the reviewing physicians who completed Residual Physical Functional Capacity Assessments of Ms. Brewer in June and December, 1992 respectively, found that Ms. Brewer was capable of lifting twenty-five pounds frequently and fifty pounds occasionally, standing and/or walking six hours out of an eight hour day, sitting for six hours out of an eight hour day, and unlimited pushing and pulling. Tr. 85, 101. Both doctors concluded that Ms. Brewer had no manipulative, visual, communicative or environmental limitations. Tr. 86, 89, 103–04. They also determined that Ms. Brewer could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, though she would never be able to climb a ladder, rope or scaffolds. Tr. 87, 102.

ALJ Niersbach concluded that Ms. Brewer possesses the residual functional capacity for the full range of light work, a conclusion supported by substantial evidence and apparently not contested by Ms. Brewer, Pl.'s Reply Brf., p. 4, and because her past work involved light exertion, she could return to it. Tr. 19–20. Accordingly, ALJ Niersbach satisfied his obligation to make the specific findings of fact listed in Social Security Ruling 82–62 and, in accordance with the applicable case law, to determine the demands of Ms. Brewer's past work as well as whether her present physical state permits her to fulfill those demands.

### E. *The ALJ Developed the Record*

■ Ms. Brewer next argues that the ALJ refused to develop the record. Pl.'s Brf., p. 13. It is true that the ALJ has a statutory duty to develop the record. *See Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988). However, "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his [or her] strongest case for benefits." *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir.1987); *see also Bady v. Sullivan*, 787 F.Supp. 809, 817–18 (N.D.Ill.1992).

At the hearing before the ALJ, Dr. Schlizhter testified that the EKG report was abnormal but that he could not make a finding of disability based only on an EKG report. Tr. 225, 238–39. Dr. Schlizhter explained that to determine Ms. Brewer's condition, a thallium exercise test should be done. Tr. 236. During the hearing, Ms. Brewer testified that she underwent various tests while hospitalized in 1993 at Holy Cross Hospital. Tr. 218–220. Ms. Brewer did not present the Holy Cross Hospital records at the hearing. In order to determine if a thallium stress test was performed on Ms. Brewer and what other tests were completed as well as the results of those tests, the ALJ requested that Ms. Brewer send him the hospital records so that he could forward them to Dr. Schlizhter for an opinion. Tr. 225–25, 239.

More than ninety days following the hearing and after the ALJ finished writing his decision, Ms. Brewer sent various medical records to ALJ Niersbach. Tr. 17–18. The ALJ noted that records from P & B Medical Services showed that Ms. Brewer was treated for colds, hypertension and vaginitis and was taking the medication mentioned above as well as antibiotics. ALJ Niersbach described the records from Holy Cross Hospital, where Ms. Brewer was treated in February, 1993, as showing the following:

> It was noted that she suffered from hypertension, diabetes and asthma. There ws [sic] no indication of myocardial infarction or stroke. Lung x rays were essentially benign and the electrocardiograms showed no change in interpretation from her prior ones. On Holter monitoring there were some PVc's and Pac's but one three beat SVT in 24 hours. The interpretation was no sustained tachy arrhythmias or brady arrhythmias and basic sinus rhythm. An echocardiogram confirmed the left ventricular hypertrophy with good ventricular contractility. The heart valves functioned well and there [was] no pericardial effusion. On discharge her condition was said to be stable.

Tr. 18. After evaluating the records, ALJ Niersbach noted that although he saw no need to send them to Dr. Schlizhter, if "[Ms. Brewer's] counsel cares to follow through I will be willing to consider any information that would make a change in this decision." Tr. 18–19.

ALJ Niersbach did not play doctor by acting as the ALJ in *Schmidt v. Sullivan,* 914 F.2d 117, 118–19 (7th Cir.1990), who determined that based on the plaintiff's current activities which included handball, the plaintiff was not disabled. Even if it was improper for the ALJ to assess the Holy Cross Hospital records, there is no indication that he relied on those records in formulating his decision, as he states that his opinion was completed before he received the records. Moreover, ALJ Niersbach invited Ms. Brewer's counsel to transmit the records to Dr. Schlizhter for his analysis and indicated that

he would take into account "any information that would make a change in [his] decision." Tr. 19. Ms. Brewer's counsel apparently did not take any action either by sending the records to the doctor or requesting that the ALJ do so. He also never asked the ALJ to order a thallium exercise test, explaining in open court at the December 22, 1995 hearing before me that he believed the test unnecessary. ALJ Niersbach did not violate his duty to adequately develop the record and was entitled to presume that Ms. Brewer had made her best case.

Finally, in light of the fact that Ms. Brewer does not contest the ALJ's conclusion that she can perform light work, Pl.'s Reply Brf., p. 4, her argument that the ALJ did not adequately develop the record in regard to either the Holy Cross Hospital records or the thallium exercise test does not assist her.[8]

### Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is granted, and Ms. Brewer's motion for summary judgment is denied.

---

**8.** My decision that ALJ Niersbach's determination that Ms. Brewer is capable of performing her past work is supported by substantial evidence renders it unnecessary to resolve Ms. Brewer's argument relating to the ALJ's conclusion that she could perform other jobs. *See* 20 C.F.R. § 404.1520(a).