MEMORANDUM OPINION AND ORDER
 

 DENLOW, United States Magistrate Judge.
 

 Plaintiff Gale Bednar (“Bednar” or “Claimant”) brings this action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security (“Commissioner”) denying Bednar’s claim for disability insurance benefits under the Social Security Act (“Act”). The Administrative Law Judge (“ALJ”) found that Bednar was not disabled as defined in the Act. The Appeals Council denied Bed-nar’s request for review.
 

 This matter comes before the. Court on cross-motions for summary judgment. The issue to be decided is whether substantial evidence in the record supports the ALJ’s finding that Bednar is not disabled under the Act. For the reasons set forth below, the Court denies Bednar’s motion for summary judgment, grants the Commissioner’s motion for summary judgment, and affirms the ALJ’s decision.
 

 I. FACTUAL BACKGROUND
 

 Gale Bednar, a 38 year old woman, first applied for disability insurance benefits on August 16, 1996, alleging a disability since February 23, 1996. This application was denied on December 13, 1996, and Bednar filed for reconsideration. The application was denied upon reconsideration on March 10, 1997. (R. 99). Bednar then requested a hearing with an ALJ. A hearing before ALJ Robert T. Karmgard was held on March 31, 1998, during which the Claimant and Meyer Klein, a vocational expert, testified. (R. 22-87). The ALJ rendered a decision against the Claimant on May 7, 1998. (R. 9). Bednar’s request for review of the ALJ’s decision was denied , by the Appeals Council on June 4, 1999, making the ALJ’s decision the final decision of the Commissioner. (R. 5).
 

 A. Testimony
 

 1. Gale Bednar’s Testimony
 

 Bednar appeared with counsel and testified at a hearing before the ALJ on March 31, 1998. (R. 22-87). Bednar was 36 years old at the time of the hearing. (R. 28). Bednar has a high school education and a year and a half of college. (R. 29). Bednar alleges disability due to injuries suffered as a result of two incidents which occurred while working as a police officer for the City of Evanston. The first incident was an auto accident that occurred on
 
 *965
 
 March 7, 1993. As a result of this accident, Bednar suffered a broken jaw and injuries to her back and both of her knees. (R. 32). As a result of the broken jaw, Bednar now wears a device in her mouth which is intended to stabilize the jaw joint. (R. 32). After this accident Bednar was assigned to less than full patrol duties until the summer of 1993, at which time she resumed full patrol duties. (R. 35-36).
 

 The second incident occurred on October 15, 1995, when she responded to a call about a women lying in the street. (R. 31). When Bednar arrived at the scene a fight was in progress and Bednar intervened. During the fight, Bednar was kicked and clubbed, resulting in injuries to her pelvis, left knee, and shoulder. (R. 31-32). She wears a brace on her left knee due to the injury. (R. 37).
 

 Bednar returned to light patrol duties in November, 1995, and continued in that capacity until February 23, 1996. (R. 38). On February 23, 1996, Bednar discontinued her police duties because the Evanston Police Department determined that she could no longer perform even light patrol duties. (R. 37). Bednar was pregnant at this time. (R. 37). Bednar gave birth to her daughter on October 13, 1996. (R. 14).
 

 Bednar claims to suffer pain in her neck, ears, jaw, back, and legs. (R. 49). She uses a TENS unit to relieve pain in her jaw, back, and sciatic nerves on both sides of her buttocks. (R. 49). She claims the pain in her jaw, back and sciatic nerves is constant with flair ups. (R. 49-50). She also complains of shoulder and cervical pain. (R. 50). Bednar also complains of severe pain in her groin area. (R. 51). Finally, Bednar claims to have difficulty differentiating between when she will pass gas and
 
 when she
 
 will pass a stool. (R. 53).
 

 As a result, Bednar claims: she cannot fully extend her arms without a lot of pain (R. 51); she cannot wear anything that will touch her vagina or her lower pelvic area (R. 51); she becomes very tired and has to lay down frequently (R. 52); her sleep is interrupted every three hours by pain (R. 52-53); she has to take a Jacuzzi or a hot shower to soothe the pain (R. 53); her husband had to install a special toilet to accommodate her (R. 53); she has to roll out of bed because her back gets so stiff from laying in bed that she cannot sit up (R. 53-54); her husband has to help her get dressed (R. 54); she can only do very limited housework, such as pushing a dust mop over the hardwood floors, doing the dishes in spurts, and retrieving the mail (R. 56); she cannot make lunch for her daughter because it is too tiring (R. 56); she cannot carry groceries (R. 60); she can drive a car only if there is an emergency or her daughter has to go to the doctor (R. 62); she can only stand up for a half an hour at a time and for a total of two hours a day (R. 62); she cannot walk very far because of her sciatic pain (R. 62); and finally, the heaviest thing she can lift is a half gallon of milk unless it is her daughter, who weighs 24 pounds (R. 62).
 

 2. Meyer Klein’s Testimony
 

 Meyer Klein, a vocational expert (“VE”), testified at the hearing. The VE classified Bednar’s past work as a police officer as medium, semi-skilled. (R. 71). He classified Bednar’s past work experiences as a home health care manager and as a car salesperson as light, semi-skilled. (R. 71). Her past work as an airline baggage manger was classified as heavy, semi-skilled. (R. 71). Her former work as a law firm receptionist was classified as sedentary, semi-skilled. (R. 71). Finally, Bednar’s past work as a phlebotomist was classified as light. (R. 76).
 

 The ALJ asked the VE to give his opinion under several hypothetical situations. (R. 70-81). In the end, the ALJ created a hypothetical individual with the following capabilities: (1) the ability to lift and carry up to twenty pounds occasionally and up to ten pounds frequently; (2) the ability to sit, stand, and walk, respectively and with normal breaks, for up to six hours in any
 
 *966
 
 eight-hour workday; (3) able to stoop and climb no more than occasionally; (4) must alternate between sitting and standing positions at intervals of one to two hours for a period of five to ten minutes on each such occasion; (5) able to lift overhead with the right upper extremity no more than occasionally; (6) avoid exposure to unprotected heights or excavations, avoid exposure to unprotected moving parts or machinery, and avoid exposure to moving vehicles in the work place; and finally, (7) unable to speak continuously for more than one hour without a break of five to ten minutes.
 

 The VE determined that such an individual would not be able to perform any of the work that Bednar previously had performed. However, the VE opined that such an individual could perform light and sedentary work as a cashier (with 5,500 jobs in the region), as an office clerk (12,-500), as an assembler (5,200), and as a Phlebotomist (1,500).
 

 C. Medical Evidence
 

 1. Dr. Neil Allen, Treating Physician
 

 Dr. Neil Allen, Bednar’s treating physician, saw Bednar on August 23, 1994. Dr. Allen’s notes reflect that Bednar suffered from neck pain and that her mouth would open only 19mm. (R. 182). Dr. Allen’s impression at this time was TMJ Dysfunction, which caused Bednar to suffer headaches. (R. 182). Dr. Allen saw Bednar on December 20,1994. At this meeting, Bed-nar complained of pain in her back, neck, and jaw. Dr. Allen injected some of Bed-nar’s muscles with pain relieving steroids and referred her to physical therapy for her jaw and shoulder. (R. 181)
 

 Dr. Allen saw Bednar again on October 19, 1995, four days after the on-duty fight. Dr. Allen noted Bednar had a knee immobilizer on her left knee. Dr. Allen’s notes reflect Bednar had tenderness in her knee, pubic trauma, and small vaginal bleeding. X-rays of the pubic bone and the left knee were negative. Dr. Allen referred Bednar to Dr. Isaacs for the vaginal bleeding. (R. 180).
 

 On March 1, 1996, Dr. Allen saw Bednar again. At this time, Dr. Allen injected six multiple trigger points in Bednar’s neck and back. He noticed left knee pain on motion but the knee was not unstable. Dr. Allen noted Bednar’s mouth opened 5.2cm and that she experienced a spasm in her left lower jaw. (R. 181).
 

 Dr. Allen once again saw Bednar on April 11, 1996. He noted Bednar was able to open her mouth three-quarters of an inch with spasm in the right jaw and left temporal region. At this time, Bednar had pain in the back and both shoulders. Bed-nar’s straight leg raising was sixty-degrees with mild back spasm. She had consistent abdominal pain and left knee pain. Dr. Allen’s impression was past trauma injuries. (R. 263).
 

 On May 9, 1996, Dr. Allen completed a Certificate of Disability by Police Surgeon to the Board of Trustees of the Police Pension Fund of the City of Evanston which stated that Bednar was disabled due to multiple traumatic injuries. He stated she suffers from TMJ dysfunction, knee injury, bilateral sciatica, fibromyalgia, and abdominal pain and cramping. Further, he stated Bednar was incapable of passing “the physical aptitude test as required by the state of Illinois for police officers due to job related injuries.” (R. 262).
 

 Dr. Allen once again saw Bednar on July 18, 1996. Dr. Allen noted Bednar may need right shoulder surgery because of a right shoulder click and pain. Bednar complained of left leg weakness from time to time and numbness on the sciatic nerve distribution, which Dr. Allen thought may be caused by fetal positioning. (R. 261).
 

 On December 5, 1996, Bednar was six weeks postpartum and Dr. Allen noted that she complained of back, neck, and jaw pains and headaches. She could not sleep on her left side because of severe hip pain. She had left leg spasms and multiple trigger points. Dr. Allen noted that Bednar
 
 *967
 
 was not taking any medications because she was breast feeding. He instructed her to resume physical therapy and restart yoga. Dr. Allen’s impression at this time was past trauma injuries and fibromyalgia. (R. 260).
 

 The last meeting between Dr. Allen and Bednar for which there are notes took place on January 30, 1997. Dr. Allen noted that Bednar’s back had positive trigger points, both her knees were painful, and she had a two-finger jaw opening. Her straight leg raising was normal at ninety degrees. Dr. Allen’s impression was fibro-myalgia, M.C.L. § knee pain, TMJ dysfunction, and sciatica. (R. 259). At this time, Dr. Allen completed another Certificate of Disability for the pension fund consistent with the one he completed on May 9,1996. (R. 258). Dr. Allen made no reference to any gynecological disorders as a basis for Claimant’s disability.
 

 2. Dr. Gerald S. Kane, Orthopedic Surgeon
 

 At the request of the City of Evanston Police Department, Dr. Gerald S. Kane examined Bednar on February 8, 1996 and again on July 12, 1996. The February 8, 1996 examination by Dr. Kane revealed cervical spine motions were full but caused pain. A cephalic compression test was positive with pain in the lower portion of the neck. There was tenderness to palpation in the right scapular region. A neurological examination of the right upper extremity was normal. Right shoulder strength was good but there was pain with extension and rotation. There was tenderness in portions of the lumbar spine. The range of motion of the lumbar spine was limited with flexion and extension. Straight leg raising was seventy degrees bilaterally. A neurologic examination of the lower extremities was normal.
 

 There was tenderness of the left knee medially and anterolaterally. The rotational signs were positive for an injury to the medial meniscus. Dr. Kane did not take x-rays at this time because of the possibility of Bednar being pregnant, but his diagnosis was cervical strain, tendinitis of the right shoulder, lumbosacral sprain, tear in the medial meniscus of the left knee, and by history, a fracture of the mandible. It was Dr. Kane’s opinion that this diagnosis prevented Bednar from returning to the full duty of being in a squad car full time because that would require too much strain on the injured areas and would result in further damage to her spine and extremities. (R. 188-189). On June 17, 1996, Dr. Kane wrote a certified letter relating his diagnosis and stating Bednar was incapable of passing the physical aptitude test required by the state of Illinois and that she was “disabled because of these injuries which occurred on March 7,1993.” (R. 190).
 

 After the July 12, 1996 examination, Dr. Kane noted Bednar still had limited motion in her cervical and lumbar spines. Her straight leg raising test was 70 degrees bilaterally and the left knee still showed tenderness, but was stable. Dr. Kane again did not take x-rays and noted that Bednar was seven months pregnant at this time. He concluded that Bednar is “disabled from doing any kind of prolonged sitting, standing, or lifting, should not be carrying objects, should not be doing any quick movements, and should avoid travel.” (R. 189).
 

 3. Drs. H. Jacob Saleh, Cheryl Nie-haus-Northey, and Marian Jelez, Gynecologists
 

 On April 8, 1996, Dr. H. Jacob Saleh, Bednar’s gynecologist, wrote a letter stating that Bednar was “pregnant with multiple orthopedic problems (of 3/7/93 and 10/15/95).” He further stated in the letter that he was recommending that Bednar “be placed on disability for the balance of her pregnancy and recovery.” He concluded, “If not for the job injuries, she would have a normal pregnancy.” (R. 187). Doctors Marian Jelez and Cheryl Niehaus-Northey wrote substantially simi
 
 *968
 
 lar notarized letters on July 19, 1996 and July 23, 1996, respectively. (R. 185-186).
 

 4. Dr. Thomas Velis, Internal Medicine
 

 On February 17, 1997, Bednar underwent an internal medicine consultative examination by Dr. Thomas Velis. Dr. Velis noted that Bednar had full range of motion in her back with moderate to- severe pain and tenderness in some of her back muscles. (R. 210). The straight leg raising test was positive in both legs at fifty-five degrees. Bednar had left knee tenderness and there was mild calf atrophy, however, there was full range of motion in all joints. She was able to bear her own weight and her gait was normal. She was not in need of an assistive device to walk. Bednar’s finger grasp strength was full and her hand grip was normal. Bednar was unable to produce sustained and understandable speech due to moderate dysarthria, caused by corrective implements placed in her mouth. Motor strength of the upper extremities was full. (R. 211).
 

 Dr. Velis’ clinical impression was lumbar strain, cervical strain, dysarthria, trauma and tear to the left meniscus, fatigue, right shoulder pain due to tendinitis, and atrophy of the left lower extremity. (R. 212). He noted that Bednar reported no change in bowel or urinary habits (R. 209) and that she felt all medical complaints were addressed by his examination. (R. 212). No gynecological problems were noted.
 

 5. Dr. Virgilio Pilapil, State Agency Physician — RFC
 

 On February 27, 1997, Dr. Virgilio Pila-pil, a state agency physician, reviewed Bednar’s medical records and prepared a Residual Functional Capacity assessment (“RFC”). Dr. Pilapil’s found that Claimant was capable of lifting up to 50 pounds occasionally and up to 25 pounds frequently. She was able to sit, stand, and/or walk, with normal breaks, for up to about six hours in an eight-hour workday. Bednar was capable of unlimited pushing and/or pulling as limited by the weight requirements for what she could lift. Bednar was capable of climbing and stooping only occasionally. She had no limitations of her manipulative abilities such as reaching in all directions, handling, fingering, and feeling. She had no visual or hearing limitations but was limited in speaking due to the dysarthria. Finally, Bednar’s RFC stated she should not be exposed to heights. (R. 216-222). Pursuant to 20 C.F.R. § 404.1567(c), these results indicate that Bednar was capable of medium exertion work.
 

 6. Dr. Peter K. Sand, Gynecologist
 

 In March 1997, Dr. Peter K. Sand, an obstetrician and gynecologist, examined Bednar regarding her severe dyspareunia and introital pain. Dr. Sand noted that Bednar had pain when walking or even when her underwear or pads touch her vulva. Dr. Sand’s review of Bednar’s genitourinary system was remarkable for post void dribbling. His exam showed marked diffuse tenderness to Q-tip palpation around the vulva with obvious diffuse er-ythema which seemed “somewhat mild in relationship to her marked tenderness.”
 

 Bednar was unable to tolerate a speculum exam but Dr. Sand was able to perform a digital exam on the introitus and a Q-tip exam of the inside of the vagina. The results showed Bednar appeared to have vulvodynia with some degree of vesti-bulitis and dyspareunia with pelvic pain. Dr. Sand instructed Bednar to discontinue using xylocaine jelly on her vulva because he felt the jelly may add to the problem over the long term. Instead, he suggested Bednar use Desitin as well as aggressively rinse her vulva after using the toilet. (R. 274).
 

 7. Dr. Linda Hughey Holt, Gynecologist
 

 Dr. Linda Hughey Holt, a gynecologist, examined Bednar twice and prepared consultative notes on April 15, 1997 and again
 
 *969
 
 on December 3, 1997. In her report of April 15, 1997, Holt reported she was seeing Bednar for a disability evaluation for vulvodynia. Bednar reported that immediately after she gave birth to her daughter she noted increased burning and little bladder control. Bednar’s symptoms at the time of this report included a “sandpaper” feeling around the vaginal introitus. This condition was very superficial and develops with anything that touches her perineum. Bednar reported being unable to stand for more than a half an hour at a time due to pain in the buttocks and also an inability to sit for any prolonged periods.
 

 Dr. Holt’s physical examination revealed some mild tenderness to deep palpation along the L4-L5 to S2-S3 region with some back pain in the Til to L3 region. A perineal inspection revealed mild atrophic vaginal introitus, mild redness and inflammation around the vulvar vestibule extending anteriorly along each side of the clitoris. Bednar was “exquisitely tender” to Q-tip touch along the minor vestibule glands. Dr. Holt did not attempt interior palpation as Bednar related a history of severe pain as a result of such exams.
 

 Dr. Holt’s impression after this April exam was pudendal neuropathy, vulvar vestibulitis syndrome, and perineal hyper-esthesia. Dr. Holt’s assessment was that Bednar would be unable to perform any type of work which involves consistent standing or sitting because pain caused by pudendal neuropathy is unpredictable. Dr. Holt felt that Bednar could only perform the type of job that allows “flexibility in both schedule and standing and sitting since she is likely to experience severe attacks with little warning.” Dr. Holt concluded by recommending a number of modalities that might be helpful in rehabilitation including use of a topical estrogen, a neurological evaluation, physical therapy, and nerve blocks. (R. 277-278).
 

 Dr. Holt’s consultative note of December 3, 1997, was prepared after she performed a second examination of Bednar. Dr. Holt noted that Bednar reports little relief from her symptomatology reported in April, 1997. Bednar reported doing perineal massage. Bednar reported additional symptoms at this time including dribbling of urine and difficulty in differentiating stool and gas, which suggested to Dr. Holt some injury to the neuroreceptors in the rectum.
 

 Dr. Holt’s perineal inspection revealed an atrophic-appearing skin with some areas of redness and inflammation around the vulvar vestibule. Pinprick sensation was
 
 normal on the
 
 labia majora but there was diminished sensation in some parts and heightened sensation in other parts of the vulvar vestibule. Bednar was unable to tolerate a digital exam vaginally nor could she even tolerate the insertion of a Q-tip.
 

 Dr. Holt’s impression was severe puden-dal neuropathy. Based on Bednar’s history, Dr. Holt said she would attribute the cause of the condition sixty-percent to the assault of October 15, 1995 and forty-percent to aggravation caused by a difficult delivery and postpartum changes. Dr. Holt felt the most important consideration was Bednar’s potential for rehabilitation. Dr. Holt noted that numerous possible routes of rehabilitation were outlined in April, however, Bednar had only done the most conservative up until the time of this December exam. Dr. Holt stated, “If [Bednar] is still to experience significant improvement within a year of childbirth, a far more aggressive approach may be necessary.” (R. 284).
 

 8. Dr. Lawrence Lieber, Orthopedic Surgeon
 

 The most recent evaluation of Bednar was taken by Dr. Lawrence Lieber, an orthopedic surgeon, at the request of the defendant’s counsel in Bednar’s pending worker’s compensation claim against the City of Evanston. Dr. Lieber’s physical exam revealed pain at the extremes of motion of the cervical spine. The range of
 
 *970
 
 motion of the shoulders, elbows, wrists, and hands was “essentially full.” Muscle strength was grossly normal throughout all muscle groups of the bilateral upper extremity.
 

 Bednar walked with a reciprocal gait and heel and toe walked with no difficulty. Bednar’s range of motion of the lumbosa-cral spine decreased at the extremes due to pain. The bilateral sciatic notch was nontender to palpation. (R. 292). Muscle testing was full to all muscle groups of the lower extremities. Dr. Lieber noted no atrophy to either leg. Straight leg raising on the left was eighty degrees. Both knees were essentially normal except for positive results in the right knee for patel-lofemoral pain, patella pain medial facet, and lateral facet. The right shoulder showed full range of motion to flexion, extension, internal/external rotation, abduction, and adduction. The shoulder area was nontender to palpation but there was positive apprehension and positive impingement. (R. 293).
 

 As a result of Dr. Lieber’s physical exam, he assessed cervical strain, low back syndrome, right knee pain, right shoulder tendinitis, and soft tissue damage to the right ankle. (R. 294) He commented that he found “no objective evidence of any significant functional impairment of [Bed-nar’s] neck, back, shoulder, knee, or ankle area that can be related to the injury sustained during her employment in 1993 or 1995.” (R. 294). Dr. Lieber concluded that “[Bednar] should be able to return to full employment with no restrictions. [She] requires no further medical treatment at this time or in the future in association with the injuries [sustained] during her employment. There is no evidence of any need for any further chiropractic treatment or other types of treatment modalities for [Bednar] in association with her work related injuries.” (R. 294).
 

 II. ESTABLISHING A DISABILITY
 

 Disability insurance benefits are available only to claimants who can establish “disability” under the terms of the Social Security Act.
 
 Brewer v. Chater,
 
 103 F.3d 1384, 1390 (7th Cir.1997). Establishing a disability under the Act is a two-part process. First, the claimant must show that she is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is expected to last for at least twelve' months, and which renders the claimant unable to engage in any substantial gainful employment. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the claimant unable to engage in any substantial gainful employment.
 
 Brewer,
 
 103 F.3d at 1390.
 

 The factual determination of disability follows a five-step evaluation laid out in the Social Security Regulations: (1) is the claimant presently employed? (2) is the claimant’s impairment severe? (3) does the impairment meet or equal one of the impairments specified in 20 C.F.R. Section 404, Subpt. P, App. 1? (4) is the claimant unable to perform her past relevant work? and (5) does the claimant’s age, education, and past work experience enable her to do other work? 20 C.F.R. § 404.1520;
 
 see also Brewer,
 
 103 F.3d at 1391.
 

 An affirmative answer at any step leads to either the next step, or at the third and fifth step, to a finding that the claimant is disabled.
 
 Garfield v. Schweiker,
 
 732 F.2d 605, 607 (7th Cir.1984). Other than at step three, a negative answer leads to a determination that claimant is not disabled.
 
 Id.
 
 The claimant bears the burden of establishing a disability in steps one through four of this five-step analysis.
 
 Brewer,
 
 103 F.3d at 1391. If the claimant satisfies his burden of proof on each of the first four steps in the analysis, the burden shifts to the Commissioner to show that the claimant — in light of her age, education, job experience, and functional capacity to work — has the ability to engage in another type of legal employment and that such employment exists in the economy.
 
 Id.
 
 
 *971
 
 See also 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).
 

 III. THE DECISION OF THE ALJ
 

 Applying the five-step evaluation, the ALJ made the following factual determinations. First, the ALJ found that Bednar was not engaged in any substantially gainful employment since the alleged onset date, satisfying the first step. (R. 19). Second, the ALJ found that Bednar’s impairments were severe, satisfying the second step. (R. 19). Third, the ALJ found that Bednar’s impairments did not meet or equal the level of severity of the impairments specified in 20 C.F.R. Section 404, Subpt. P, App. 1, not satisfying the third step. (R. 19). Since failure at the third step is not fatal to Bednar’s claim, the evaluation continued to the fourth step. Fourth, the ALJ determined that Bednar was unable to perform any of her past relevant work, satisfying the fourth step. (R. 20). Finally, the ALJ found that Bed-nar had a RFC to perform a limited range of light work. (R. 20). Based on this RFC and the testimony of the VE, the ALJ found that Bednar could perform jobs existing in significant numbers in the economy. (R. 20). Because the ALJ found that there were a significant number of jobs existing in the economy that Bednar could perform, the ALJ ultimately found that Bednar was not disabled as defined in the Act.
 

 IV. THE STANDARD OF REVIEW
 

 Judicial review of the Commissioner’s final decision is governed by 42 U.S.C. § 405(g), which provides that “the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.... ” An ALJ’s decision becomes the Commissioner’s final decision if the Appeals Council denies a request for review.
 
 Wolfe v. Shalala,
 
 997 F.2d 321, 322 (7th Cir.1993). Under such circumstances, the decision reviewed by the district court is the decision of the ALJ.
 
 Eads v. Secretary of the Dept. of Health, and Human Serv.,
 
 983 F.2d 815, 816 (7th Cir.1993).
 

 A reviewing court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner.
 
 Knight v. Chater,
 
 55 F.3d 309, 313 (7th Cir.1995). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching its decision and whether there is substantial evidence in the record to support the findings.
 
 Scivall
 
 y
 
 v. Sullivan,
 
 966 F.2d 1070, 1075 (7th Cir. 1992); 42 U.S.C. § 405(g). Substantial evidence is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”
 
 Richardson v. Perales,
 
 402 U. S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The ALJ’s decision must be affirmed if the findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support the claimant’s argument. 42 U.S.C. § 405(g); see also
 
 Pope v. Shalala,
 
 998 F.2d 473, 480 (7th Cir.1993). The court may reverse the Commissioner’s decision only if the evidence “compels” reversal, not merely because the evidence supports a contrary decision.
 
 INS v. Elias-Zacarias,
 
 502 U.S. 478, 481, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992). Finally, a credibility determination made by the ALJ will not be disturbed unless it is patently wrong.
 
 Brewer,
 
 103 F.3d at 1392.
 

 V. THE ALJ’S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD.
 

 The Court finds there is substantial evidence in the record to support the ALJ’s factual determination of Bednar’s claim. Using the five-step process outlined in 20 C.F.R. § 416.920(b) — (f), the ALJ found that at the time of the hearing: (1) Bednar was unemployed; (2) Bednar’s impairments were severe; (3) Bednar’s impairments did not meet or equal any of the listings of specified impairments in 20 C.F.R. § 404, Subpt. P, App. 1; (4) Bed-
 
 *972
 
 nar was unable to perform her past relevant work; and (5) there exists a significant number of sedentary and light jobs in the economy which Bednar could perform, as determined by Medical-Vocational rules 202.21 or 202.22 and supplemented by the testimony of the VE. (R. 19-20).
 

 Bednar challenges the ALJ’s determination on two grounds. First, Bednar contends the ALJ failed to appropriately consider all the evidence in the record. The Court disagrees and finds that the ALJ gave appropriate weight to the evidence and did not ignore evidence that supports an opposite conclusion. Second, Bednar argues that the ALJ’s determination that Bednar is not disabled is wrong because the ALJ impermissibly substituted his own judgment for that of a physician. The Court again disagrees.
 

 A. The ALJ’S RFC Assessment is Supported by Substantial Evidence.
 

 An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow a reviewing court to trace the path of his reasoning.
 
 Diaz v. Chater,
 
 55 F.3d 300, 307 (7th Cir.1995);
 
 Herron v. Shalala,
 
 19 F.3d 329, 333 (7th Cir.1994). An ALJ’s failure to consider an entire line of evidence falls below the minimum. level of articulation required.
 
 Diaz,
 
 55 F.3d at 307;
 
 Herron,
 
 19 F.3d at 333. However, the ALJ’s opinion here did not fail in this respect.
 

 A reading of the ALJ’s well-reasoned decision provides a strong indication that the ALJ did consider all the relevant opinions and conclusions of the various doctors. (R. 13-19). For example, the ALJ specifically identifies Dr. Allen, Dr. Holt and Dr. Lieber and carefully summarizes the medical evidence. (R. 13-19). Finding number 3 accurately summarizes Claimant’s medical impairments. (R. 19). In light of the above, the ALJ satisfied the articulation standard because the Court can track the ALJ’s reasoning and feels assured that the ALJ considered the important evidence.
 
 Diaz,
 
 55 F.3d at 308.
 

 B. The Medical Evidence in the Record Provides Substantial Evidence to Support the Finding that Bed-nar is “Not Disabled.”
 

 The medical evidence in this case provides substantial • evidence to support the ALJ’s finding. Bednar’s brief argues that the ALJ impermissibly decided this case by substituting his judgment for that of a physician. To support this argument, Bednar points to the ALJ’s statement that, despite her testimony about her symptoms, Bednar “has not generally received the type of medical treatment one would expect for a totally disabled individually.” (R. 17). However, this statement was given by the ALJ to explain his observation that “no surgical intervention” is contemplated for her knee and shoulder conditions, “no specific treatment for her pelvic injury” was underway, and “speech therapy was never recommended” for her jaw dysfunction. (R. 17).
 

 More importantly, the existence of relevant medical evidence supporting the ALJ’s determination that Bednar is not disabled belie Bednar’s argument. In her brief and at oral argument, Bednar relies on
 
 May v. Apfel,
 
 1999 WL 1011927 (N.D.Ill.) (Pallmeyer, J.). In
 
 May,
 
 the Plaintiff alleged that the ALJ improperly substituted her opinion for those of the Plaintiffs treating physicians.
 
 Id.
 
 at *22. The
 
 May
 
 court agreed and found that, in light of the “paucity” of medical evidence in the record, it was improper for the ALJ to make an unsupported determination that the Plaintiffs pain could be managed “through conservative treatment measures.”
 
 Id.
 
 at *23. However, the case at bar is distinguishable from
 
 May.
 
 Unlike in
 
 May,
 
 the medical record in this case is complete. Moreover, the evidence in the record supports the ALJ’s decision that Bednar is not disabled.
 

 
 *973
 
 In reaching his conclusion the ALJ relied on the most recent examination of Bednar, which was completed by Dr. Lieber. Dr. Lieber reported that he found no objective evidence that Bednar suffered any significant functional impairments of her neck, back, shoulder, knee, or ankle, and should be able to return to full employment with no restrictions. (R. 17 and 294). Bednar argues the ALJ should not rely on Dr. Lieber’s conclusions because Dr. Lieber is an orthopedic surgeon and did not conduct a gynecological exam.
 

 However, the ALJ considered the gynecologist’s opinion and found that Bednar suffered from pudendal neuropathy and vestibulitis. (R. 19 and 277). Despite this, the ALJ determined that Bednar’s genitourinary impairments were not disabling from performing light work. This conclusion is consistent with Claimant’s treating physician, Dr. Allen, who never cited Claimant’s gynecological condition as disabling and Dr. Holt’s conclusion after her April, 1997 examination that Claimant could perform the type of job that allows “flexibility in both schedule and standing and sitting ...” (R. 277). It also reflects the fact that Claimant made no mention of gynecological issues to Dr. Velis in February, 1997.
 

 In light of the medical evidence and the ALJ’s credibility determination, the record fully supports the ALJ’s conclusion that Bednar is not disabled and can perform a limited range of light work. It is not the function of this Court to second-guess the ALJ’s conclusion when a factual basis exists for the conclusion reached.
 

 VI. CONCLUSION
 

 For the foregoing reasons, Bednar’s motion for summary judgment is DENIED, the Commissioner’s motion for summary judgment is GRANTED, and the decision of the ALJ dated May 7, 1998 is hereby AFFIRMED. Judgment is entered in favor of Defendant, Kenneth S. Apfel, Commissioner of Social Security, and against Plaintiff, Gale Bednar.